## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SALLY BOSQUE,<br><br>                    Plaintiff,<br><br>v.<br><br>CAN CORPORATION OF AMERICA, INC.,<br><br>                    Defendant. | JURY TRIAL DEMANDED<br><br>Civ. No.  _____ |

## **COMPLAINT**

Plaintiff, Sally Bosque, by and through her counsel, Mobilio Wood, files the instant Complaint against Defendant, Can Corporation of America, Inc., averring in support thereof as follows:

### **Introduction**

1.      This cause of action arises out of Plaintiff Sally Bosque's former employment with, and termination from, Defendant Can Corporation of America, Inc.

2.      Plaintiff asserts claims and seeks monetary damages for hostile work environment sexual harassment, associational discrimination based on race, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

## Parties

3.     Plaintiff Sally Bosque ("Plaintiff") is an adult individual and former employee of Defendant Can Corporation of America, Inc.

4.     Defendant Can Corporation of America, Inc. ("Defendant" or the "Company") is a business organization that owns and/or operates a can manufacturing facility located at 326 June Ave., Blandon, Pennsylvania 19510.

5.     At all times relevant and material herein, Defendant acted by and through its ostensible and/or actual agents, servants, workmen and/or employees.

## Jurisdiction and Venue

6.     This Court has jurisdiction over Plaintiff's claims in accordance with 28 U.S.C. § 1331 because this civil action arises under a law of the United States and seeks redress for violations of a federal law.

7.     This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this Commonwealth and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice.

8.     Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendant is subject to personal jurisdiction in this district.

**Exhaustion of Administrative Remedies**

9.      On July 30, 2020, Plaintiff dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") against Defendant, alleging that Defendant unlawfully discriminated against her on the basis of her sex and race, and retaliated against her for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951 *et seq.* ("PHRA").

10.      On December 29, 2020, upon Plaintiff's request, the EEOC issued a Notice of Right to Sue to Plaintiff.[1]

**Factual Allegations**

**A.      Plaintiff's Commencement of Employment with Defendant and Her Workplace Reporting Hierarchy**

11.      Plaintiff's sex is female.

12.      Plaintiff's race is Caucasian.

---

[1] Plaintiff intends to file a motion for leave to amend the instant Complaint to assert claims for violation of the PHRA against Defendant following the expiration of 12 months from the date of dual-filing her Charge of Discrimination with the PHRC.

13.     Plaintiff was hired by Defendant as a Quality Control Inspector in July 2019.

14.     Plaintiff was initially trained on first shift (6:00 A.M. to 6:00 P.M.), but was transferred to second shift (6:00 P.M. to 6:00 A.M.) at the conclusion of her training in August 2019.

15.     As a Quality Control Inspector, Plaintiff reported to Group Leader, Theresa Pauley ("Pauley"), and Manager, John Haag ("Haag").

16.     Defendant's Human Resources department was headed by Human Resources Manager, Susan Seighman ("Seighman").

**B.     Plaintiff is Subjected to an Open and Ongoing Sexually Hostile Work Environment, and Repeatedly Complains to her Group Leader about the Harassment to No Avail**

17.     Soon after Plaintiff's transfer to second shift, she became the target of a course of persistent sexual harassment at the hands of her male coworker, Jacques Pacheco ("Pacheco").

18.     Pacheco's harassing conduct included, but was not limited to, the following:

        a)     Telling Plaintiff that she was "beautiful";

        b)     Stating that he "like[d] to watch" Plaintiff;

        c)     Making sexually suggestive facial expressions with his tongue towards Plaintiff;

     d)     Asking Plaintiff for her phone number;

     e)     Intensely staring at Plaintiff whenever she was in his vicinity;

     f)     Nodding his head up and down in a bouncing manner to mimic the movement of Plaintiff's breasts as she walked past him; and

     g)     Staring at Plaintiff's breasts when she needed to discuss work-related matters with him.

19.     Pacheco's harassment was routine and occurred openly.

20.     In fact, Pacheco often accosted Plaintiff in the Company cafeteria in the purview of Plaintiff's coworkers and supervisors.

21.     Plaintiff repeatedly advised Pacheco that she had a boyfriend, that she was not romantically interested in him, and that his conduct was inappropriate, but Pacheco's conduct continued unabated.

22.     Further, Plaintiff complained to her Group Leader, Pauley, about Pacheco's conduct on several occasions, but Pauley took no action against Pacheco.

23.     Not only did Plaintiff's supervisor, Pauley, refuse to address Plaintiff's harassment complaints, but Pauley herself contributed to a discriminatory work environment by making derogatory comments in Plaintiff's (and other employees') presence about a male subordinate who Pauley believed was gay.

24.     For instance, Pauley repeatedly stated, "He's so gay," whenever the employee left her vicinity, and accused the employee of "checking out" other male employees.

25.     Pauley's openly bigoted remarks (including additional remarks described immediately below) caused Plaintiff to become reluctant to voice additional complaints about the sexual harassment that she was enduring.

## C.     Plaintiff is Subjected to Racial Harassment Due to Her Relationship with Her Hispanic Coworker

26.     Soon after Plaintiff began working for Defendant, she began dating one of her coworkers, Santos Velazquez.

27.     Mr. Velazquez is a Hispanic male.

28.     Plaintiff's relationship with Mr. Velazquez was well-known to her colleagues and supervisors.

29.     A number of Plaintiff's colleagues and supervisors regularly voiced their disdain for Hispanic persons in the workplace, as well as the interracial relationship between Plaintiff and Mr. Velazquez.

30.     For instance, Plaintiff's coworkers asked Plaintiff why she was dating Mr. Velazquez, and told Plaintiff that she "should be with [her] own kind."

31.     In addition, one of Plaintiff's coworkers stated to Plaintiff, "If you keep fucking Puerto Ricans your pussy is going to smell like rice and beans."

32.     Further, in addition to Group Leader Pauley's homophobic rhetoric described above, on numerous occasions she commented on how "stupid" Defendant's Hispanic employees were, and stated that "if they can't speak our language then they shouldn't be able to work in our country."

33.     At the time of Plaintiff's employment, Pauley had been employed by Defendant for more than fifteen (15) years.

34.     Pauley's racist remarks were sometimes made in the presence of Department Manager Michael Wertz ("Wertz"), who had been employed by Defendant for more than thirty (30) years.

35.     Wertz at times chimed in with his own bigoted views, stating, among other things, that Defendant needed to hire "quality people" rather than the Hispanic employees who "barely speak English" and always "fuck up" the machines, and that the only reason Defendant hires Hispanic employees are because they are the only individuals willing to work for the low pay.

36.     Notably, one of Plaintiff's supervisors advised her that upon learning of Plaintiff's relationship with Mr. Santos, Defendant's management was looking "real hard" to find a means of terminating Plaintiff and Mr. Santos.

**D.     Defendant Orders Plaintiff to Quarantine After She Displays COVID-19 Symptoms in the Workplace**

37.     On April 5, 2020, during a routine employee temperature check implemented by Defendant at the outset of the COVID-19 pandemic, Defendant's representatives observed Plaintiff appearing visibly ill, and suspected her of displaying symptoms of COVID-19.

38.     Although Plaintiff did not have a fever, Defendant's representatives continued to monitor Plaintiff's temperature throughout her shift, and eventually Plaintiff's Manager, Haag, advised Plaintiff, "You look like shit," and instructed her to go home.

39.     On April 6, 2020, Defendant's Human Resources Manager, Seighman, called Plaintiff and left a voicemail on Plaintiff's phone, directing Plaintiff not to return to the workplace unless and until she was tested for COVID-19 and received a "negative" result.

40.     Plaintiff initially scheduled an appointment with her primary care doctor, but her primary care doctor was only taking appointments over the phone at the time, and advised Plaintiff that she needed to find a provider who could see her in person.

41.     Over the course of the next several days, and after one unsuccessful attempt to be tested for COVID-19 at a local hospital, Plaintiff drove to a hospital approximately 30 minutes from her home where she was tested for COVID-19.

42.     Plaintiff kept in contact with Defendant's Human Resources Manager, Seighman, during her absence, in order to update Seighman on the status of her COVID-19 test.

43.     On or around April 21, 2020, Plaintiff received a "negative" COVID-19 test result from her medical provider via U.S. Mail, and provided Seighman with a copy of the test result on that same date.

44.     Plaintiff returned to work on or around April 23, 2020.

**E.     Plaintiff Lodges an Additional Complaint About Pacheco's Harassment on June 3, 2020**

45.     On June 3, 2020, Pacheco again began sexually harassing Plaintiff, most notably staring down at her breasts and grinning while she was attempting to convey work assignments to him.

46.     Plaintiff complained to her Manager, Haag, about Pacheco's conduct.

47.     Haag casually responded that he would "shoot HR an email," and that in the meantime Plaintiff should merely "ignore" Pacheco.

48.     Plaintiff therefore returned to her shift alongside Pacheco.

49.     Unsatisfied by Haag's response, Plaintiff complained to her Group Leader, Pauley, about Pacheco's conduct.

50.     Plaintiff pressured Pauley to act, and reminded Pauley that she had already complained to her on several occasions.

51.     Pauley therefore escalated Plaintiff's complaint to Plaintiff's Manager, Haag, for a second time that evening.

52.     After Pauley spoke with Haag, she advised Plaintiff that Haag responded that he was "too busy," "ha[d] too much to do," and that he "d[i]dn't have a translator."[2]

53.     Pauley stated that Plaintiff would need to "wait for HR," and reiterated that Plaintiff should simply "ignore" Pacheco for the remainder of her shift.

54.     Plaintiff therefore worked the rest of her shift alongside her harasser, Pacheco.

55.     Near the end of Plaintiff's shift, Haag approached Plaintiff and stated that he had spoken with Human Resources Manager Seighman about Plaintiff's complaint.

56.     Haag told Plaintiff that Seighman had requested that she write a formal statement to "prove" her allegations.

---

[2] Pacheco's primary language is Spanish, although he speaks English as well.

57.    Haag made air-quotes with his hands and rolled his eyes as he uttered the word "prove."

**F.    Plaintiff Files a Written Complaint About Pacheco's Harassment with Defendant's Human Resources Manager on June 5, 2020**

58.    Plaintiff's next shift was on the evening of June 4, 2020, into the morning of June 5, 2020.

59.    When Plaintiff arrived to work on June 4, 2020, no one from Defendant's Human Resources department had contacted her about her sexual harassment complaint one day earlier.

60.    Plaintiff's harasser, Pacheco, was also working on the evening of June 4, alongside Plaintiff.

61.    Defendant's refusal to separate Pacheco from Plaintiff or otherwise take any action whatsoever in response to Plaintiff's harassment complaint caused Plaintiff significant anxiety.

62.    In the early morning of June 5, 2020, during Plaintiff's shift, she emailed the requested written statement to Human Resources Manager Seighman.

63.    Plaintiff's written statement provided:

Susan,

John told me this morning that you would like examples of "proof" of what I have been dealing with over the last several months. I will give you some of the more disrespectful and uncomfortable situations that I been working with.

From Day 1 on 2nd shift I was on the coating/Littel rotation so I met him (Jacques Pacheco) right away. He asked me if I danced the Machatta which is a very sexual Hispanic dance and then kept asking to teach me and asked me for my number. I told him I had a boyfriend and still he pressed the subject. Because I was new to the shift and already felt awkward and wanted to get to know everyone and not come off as a problem, I just waited out the week and politely declined his requests and kept it moving. Already at that point I could feel him intensely watching me as I worked but just did my job with little to no contact and hoped the next time in that department would be better.

As time has gone on over the several months the disrespect has only gotten worst and became more of a stalking behavior vs a verbal one. What I mean by that is as I would be doing my checks he would literally stop whatever it is he is doing to stare at me intensely.  I would catch him positioning himself wherever he felt he had a better view. More than one time I asked him if he was enjoying watching me (sarcastically) and he ALWAYS would reply "oh yeah" in the creepiest way possible. To have him place himself and to sit and stare at me like that, not even trying to do it subtly was incredibly disrespectful to me in how I viewed it. Telling him yet still nothing changed or stopped. Again, I would just try to get through my rotation in the dept hoping to avoid him if at all possible and even when I made it very obvious that I was not going to speak to him unless about the sheets, I could always see and feel him watching me while back there even at other stations.

On occasions where he was placed back in he [sic] sorting area, he would always stop as I walked up and would nod his head up and down in a bouncing manner as I walked up to mimic following my chest bouncing up and down. On this occasion, I had had it with his perversions and yelled at him to get the F back to work and stop watching me.  Again, he did as he always had done and just laughed.

The night that I finally hit my ceiling with putting up with his disrespect and ended up reporting it to John Haag was when I was speaking to him about the sheets and he kept looking me up and down

focusing mainly on my chest meanwhile a HUGE smile on his face (no mask on) as if he won the lottery. I found it very ignorant of him and had to walk away.

This is a very ignorant man that just doesn't care about my discomfort when doing these things and has gone as far as to do it even when Im with [Mr. Velazquez]. Which needless to say isn't the smartest thing to pull.

So, basically I would feel a lot better if he would not speak to me unless about work or do his "watching" every move I make. I hope this gives you a basic ideas of what I been dealing with and can help me put a end to it finally.

Thank you,

Sally Bosque

(A true and correct copy of Plaintiff's written statement is attached hereto as

**Exhibit "A"**).

## G.    Defendant's Disciplinary Point Policy and Plaintiff's Accrued Disciplinary Points as of June 5, 2020

64.    Defendant's employee handbook provides that "[u]p to five and three-quarters (5 ¾) points are permissible under th[e] attendance control program within a rolling twelve (12) month period."

65.    Pursuant to the employee handbook, points are assessed as follows:

a)    Late/Leave early (less than 30 minutes): ¼ point;

b)    Late/Leave early (more than 31 minutes): ½ point;

c)    Absent one full shift: 1 point;

      d)      Consecutive absences (personal illness or injury): 1 point; and

      e)      Failure to call or show for work: 1 ½ point/day.

66.     Defendant's employee handbook further provides that an employee who reaches 6 points will be terminated, and that points which are more than twelve months old are dropped from an employee's record.

67.     As of the start of Plaintiff's shift on June 4, 2020, she had accrued a total of 4.5 disciplinary points.

68.     Plaintiff's most recent disciplinary points had been assessed on February 26, 2020, and Plaintiff's last absence had been during her COVID-19-related employer-mandated quarantine in mid-April 2020.

**H.    Defendant Singles Out Plaintiff for Surveillance and Terminates Her Within Hours of Receiving Her Written Harassment Complaint, Based on Plaintiff's Alleged Violation of a Policy that Was Not Uniformly Enforced**

69.     In the late afternoon on June 5, 2020, Human Resources Manager Seighman emailed Plaintiff and instructed Plaintiff not to report to work until she contacted Seighman.

70.     When Plaintiff called Seighman, Seighman advised Plaintiff that Defendant was terminating Plaintiff's employment because she had allegedly taken "too long of a break" during her shift earlier that day, as well as for unspecified "attendance" issues.

14

71.    Seighman also spoke with Plaintiff's boyfriend, Mr. Velazquez, and stated that Defendant was terminating Mr. Velazquez's employment for the same reasons.[3]

72.    Plaintiff had never previously been counseled or disciplined with respect to the length of her breaks, and had not missed a day of work since returning from her employer-mandated COVID-19-related quarantine in April 2020.

73.    Defendant's employee handbook provides that employees who work more than 10 hours in a shift are allowed three 10-minute breaks and one 30-minute lunch per shift.

74.    Defendant's employee handbook does not assign a disciplinary point value to instances of an employee exceeding his or her allotted break length.

75.    Notably, with the exception of employees who choose to leave Defendant's premises during their 30-minute lunch (not applicable in the instant matter), Defendant does not require that employees punch a time clock for their breaks, or utilize any other formal means of monitoring employee break lengths.

76.    Instead, according to Defendant's Position Statement filed with the EEOC, following receipt of Plaintiff's sexual harassment complaint on June 3,

_____

[3] Mr. Velazquez filed a Charge of Discrimination with the EEOC, which is currently pending.

2020, Plaintiff's Manager, Haag, visually "monitored" Plaintiff for the duration of her shift on June 5, 2020 – beginning with Plaintiff's first of four breaks, one hour into her shift – and purportedly determined that Plaintiff had exceeded her allotted break time on each occurrence.

77.     Upon information and belief, Haag had never tracked Plaintiff's coworkers throughout their shifts in order to determine the length of their breaks.

78.     Indeed, Plaintiff previously observed numerous coworkers and supervisors exceed their allotted break times on a regular basis, but none of those employees were terminated.

79.     In fact, more than one of Plaintiff's coworkers had been caught sleeping in their cars after failing to return from their breaks for an extended period of time – and one coworker in particular had been discovered sleeping in his car on multiple occasions – but those employees were not terminated for their conduct.

80.     Further, at least two of Plaintiff's coworkers had exceeded their maximum allotted 6 disciplinary points, but were not terminated.

81.     Nevertheless, based on Haag's post-complaint surveillance of Plaintiff and his alleged observations regarding the length of Plaintiff's breaks, Defendant terminated Plaintiff's employment within 24 hours of Plaintiff filing a written complaint regarding sexual harassment in the workplace.

82.     Plaintiff's harasser, Pacheco, was not terminated for sexually harassing Plaintiff.

## COUNT I

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

83.     Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

84.     Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f).

85.     Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b), and employed more than 500 persons.

86.     Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

87.     Throughout the course of Plaintiff's employment, she was subjected to unwelcomed harassment by Pacheco due to her sex.

88.     Pacheco's harassment of Plaintiff was severe and pervasive.

89.     Pacheco's harassment detrimentally affected Plaintiff, and would have detrimentally affected a similarly situated reasonable person.

90.    Pacheco's harassment occurred openly and in the presence of Plaintiff's coworkers and supervisors.

91.    Plaintiff complained about Pacheco's harassment on several occasions to her Group Leader, Pauley, and eventually complained to her Manager, Haag, as well as Defendant's Human Resources Manager, Seighman.

92.    Defendant either was aware, or should have been aware, of Pacheco's harassment, but failed to take appropriate corrective action against him.

93.    By allowing its managers and supervisors to openly voice discriminatory insults and hate speech in the workplace, Defendant fostered an atmosphere where a reasonable employee would be reluctant to complain about unlawful discrimination.

94.    Defendant failed to provide a reasonable avenue for Plaintiff to complain of Pacheco's harassment.

95.    Through its conduct, Defendant violated Title VII.

96.    Defendant acted with reckless indifference to Plaintiff's rights under federal law, warranting an award of punitive damages.

97.    As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, and psychological and emotional harm.

## COUNT II

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: RETALIATION

98.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

99.   Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f).

100.   Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. §2000e(b), and employed more than 500 persons.

101.   Title VII provides that it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).

102.   On June 3, 2020, Plaintiff filed a good-faith complaint of workplace sexual harassment with her Group Leader, Pauley, and her Manager, Haag.

103.   On the morning of June 5, 2020, Plaintiff filed a written good-faith complaint of workplace sexual harassment with Defendant's Human Resources Manager, Seighman.

104.   In the late afternoon of June 5, 2020, Defendant terminated Plaintiff's employment, alleging that Plaintiff had taken "too long of a break" during her shift earlier that day, and further citing unspecified "attendance" issues.

105.   Plaintiff had not been absent from work since her employer-mandated COVID-19 quarantine in mid-April 2020.

106.   Plaintiff's coworkers and supervisors repeatedly exceeded the length of their allotted breaks, but were not terminated.

107.   At least two of Plaintiff's coworkers had exceeded their maximum allotted 6 disciplinary points, but were not terminated.

108.   Defendant does not monitor employee break lengths via a punch clock or any other formal means.

109.   In response to Plaintiff's sexual harassment complaint, Haag singled out Plaintiff and surveilled her for the specific purpose of establishing a pretextual reason to terminate her.

110.   Prior to the start of Plaintiff's last full day of employment with Defendant, she had only accrued 4.5 disciplinary points.

111.   Defendant's employee handbook provides that an employee will be terminated upon accruing 6 disciplinary points.

112.   Defendant's employee handbook does not assign a disciplinary point value to instances of employees exceeding their allotted break lengths.

113.   Based on Haag's surveillance of Plaintiff, Defendant terminated Plaintiff due to her alleged violation of a policy that Defendant did not enforce uniformly.

114.   Further, even if Plaintiff did exceed the length of her allotted breaks on June 5, 2020, her conduct was justified in light of the anxiety caused to her by Defendant's refusal to separate Plaintiff from her harasser, or to take any action whatsoever in response to her harassment complaint one day earlier.

115.   Plaintiff's harasser, Pacheco, was not terminated for sexually harassing Plaintiff.

116.   Through its conduct, Defendant violated Title VII.

117.   Defendant acted with reckless indifference to Plaintiff's rights under federal law, warranting an award of punitive damages.

118.   As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

## COUNT III

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: ASSOCIATIONAL DISCRIMINATION BASED ON RACE

119.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

120.   Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f).

121.   Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. §2000e(b), and employed more than 500 persons.

122.   Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).

123.   Plaintiff's race is Caucasian.

124.   Plaintiff was qualified for the position of Quality Control Inspector.

125.   Plaintiff was involved in an interracial dating relationship with her Hispanic coworker, Mr. Santos.

126.   Plaintiff's coworkers and managers openly expressed anti-Hispanic sentiment, and specifically voiced opposition to Plaintiff's interracial relationship with Mr. Santos.

127.   Plaintiff's supervisor cautioned Plaintiff that Defendant's management was attempting to manufacture a reason to terminate Plaintiff and Mr. Santos due to their relationship.

128.   On June 5, 2020, Defendant abruptly terminated Plaintiff's employment, alleging that Plaintiff had taken "too long of a break" during her shift earlier that day, and further citing unspecified "attendance" issues.

129.   Plaintiff had not been absent from work since her employer-mandated COVID-19 quarantine in mid-April 2020.

130.   Plaintiff's coworkers and supervisors repeatedly exceeded the length of their allotted breaks, but were not terminated.

131.   At least two of Plaintiff's coworkers had exceeded their maximum allotted 6 disciplinary points, but were not terminated.

132.   Defendant does not monitor employee break lengths via a punch clock or any other formal means.

133.   Instead, Haag singled out Plaintiff and surveilled her for the specific purpose of establishing a pretextual reason to terminate her.

134.   Prior to the start of Plaintiff's last full day of employment with Defendant, she had only accrued 4.5 disciplinary points.

135.   Defendant's employee handbook provides that an employee will be terminated upon accruing 6 disciplinary points.

136.   Defendant's employee handbook does not assign a disciplinary point value to instances of employees exceeding their allotted break lengths.

137.   Based on Haag's surveillance of Plaintiff, Defendant terminated Plaintiff due to her alleged violation of a policy that Defendant did not enforce uniformly.

138.    Further, even if Plaintiff did exceed the length of her allotted breaks on June 5, 2020, her conduct was justified in light of the anxiety caused to her by Defendant's refusal to separate Plaintiff from her harasser, or to take any action whatsoever in response to her harassment complaint one day earlier.

139.    Through its conduct, Defendant violated Title VII.

140.    Defendant acted with reckless indifference to Plaintiff's rights under federal law, warranting an award of punitive damages.

141.    As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

### Prayer for Relief

**WHEREFORE**, Plaintiff pray that a judgment be entered in her favor and against Defendant in the following respects:

a)    An order awarding compensatory damages and punitive damages on Count I;

b)    An order awarding back pay, front pay, compensatory damages, and punitive damages on Counts II and III;

c)    An order awarding attorneys' fees and expenses on Counts I, II, and III pursuant to 42 U.S.C. § 2000e-5(k);

d)      An order awarding pre-judgment and post-judgment interest; and

e)      All other relief as the Court deems just and equitable.

### Jury Demand

Plaintiff demands a jury trial on all issues so triable.

                                    Respectfully submitted,

Date:  2/5/2021                BY:   *s/ Peter C. Wood, Jr.*
                                    Peter C. Wood, Jr., Esq. (I.D. No. 310145)
                                    **MOBILIO WOOD**
                                    900 Rutter Ave., Box 24
                                    Forty Fort, PA 18704
                                    Phone: (570) 234-0442
                                    Fax: (570) 266-5402
                                    peter@mobiliowood.com

                                    Matthew Mobilio, Esq. (I.D. No. 209439)
                                    **MOBILIO WOOD**
                                    609 W. Hamilton St., Suite 301
                                    Allentown, PA 18101
                                    Phone: (610) 882-4000
                                    Fax: (866) 793-7665
                                    matt@mobiliowood.com

                                    *Counsel for Plaintiff Sally Bosque*